Fannie FEIN (Plaintiff) Appellant,

v.

Edward K. SCHWARTZ and Burnett Schwartz, (Defendants) Respondents.

No. 31772.

St. Louis Court of Appeals.

Missouri.

March 15, 1966.

Motion for Rehearing or for Transfer to Supreme Court Denied April 12, 1966.

Application to Transfer Denied June 13, 1966.

Newmark & Baris, Irl B. Baris, St. Louis, for appellant.

H. Jackson Daniel, St. Louis, for respondents.

RUDDY, Presiding Judge.

Appellant herein, Fannie Fein, had been the owner of a parcel of improved real estate known as the Midtown Hotel located at 2935 Lawton Avenue in the City of St. Louis, Missouri. This property was in the Mill Creek Redevelopment Project Area being redeveloped by the Land Clearance for Redevelopment Authority of the City of St. Louis, a municipal corporation, which we shall hereinafter refer to as the Authority. The Authority agreed to purchase appellant's property for the sum of $292,000 and at the time of the closing of the purchase contract and of the transfer of title the Authority withheld $15,000 of the purchase price as a result of service on it of a notice of an attorney's lien claimed by the respondents herein, wherein they claimed an interest in the proceeds of the sale. Appellant brought suit against the Authority to recover the sum of $15,000, which the Authority had refused to pay her, and thereupon the Authority interpleaded the sum of $15,000 and paid it into the registry of the court and was thereafter discharged from the suit. Respondents herein, Edward K. Schwartz and Burnett Schwartz, attorneys at law, through their answer and interplea claimed an attorney's lien upon the aforesaid sum by reason of a verbal contract, wherein appellant and her husband agreed to pay the said respondents as professional fees for their legal services an amount equal to five percent of the price received resulting from the sale to or condemnation by the Authority of the aforesaid premises. Respondents' answer and interplea was in two counts. Count I sought recovery under the aforesaid contract for an amount equal to five percent of the price resulting from the sale of the named premises and for an order and judgment that respondents were entitled to an attorney's lien upon the fund paid into the registry of the court. Respondents also sought an order from the court, under Count I, directing the payment of said fund to them. As an alternative to the relief sought in Count I, respondents sought relief in Count II upon the theory of quantum meruit and asked judgment for the sum of $15,000.

Appellant filed a reply and counterclaim. The case was tried in an equity division of the St. Louis Circuit Court without the aid of a jury. The trial court found in favor of the respondents under Count I in the sum of $14,600 and decreed that respondents "have a special attorney's lien in said amount on and against the funds heretofore paid into the registry of this court," and directed the Clerk of the Court to pay the sum of $14,600 to the respondents out of the sum deposited in the court and directed that the balance of said deposit be paid over unto the appellant. Thereafter, appellant appealed to this court.

The trial court in its judgment and decree dismissed Count II of respondents' answer and interplea and dismissed appellant's counterclaim. No points have been raised in connection with the court's action in dismissing the two aforesaid pleadings and our review will be limited to the court's findings, judgment and decree in connection with Count I of respondents' answer and interplea.

■ In the principal point relied on by the appellant she asserts the trial court erred in deciding that respondents were entitled to assert an attorney's lien. As we have pointed out, this proceeding was tried on the equity side of the court and in an equity action we review the case upon both the law and the evidence and determine the credibility, weight and value of the oral testimony and other evidence in the case, but in doing so we give due deference to the trial chancellor's findings as evidenced by its decree and do not set aside the judgment unless it is clearly erroneous. Long v. Kyte, Mo., 340 S.W.2d 623, 628; Section 510.310 subd. 4, RSMo 1949, V.A.M.S.

Respondents herein are attorneys at law and respondent, Edward K. Schwartz, at the time of his testimony had been in the active practice of the law for forty years and respondent, Burnett Schwartz, a son of Edward K. Schwartz, had been a practicing attorney since December 1949 and was associated with his father.

The pertinent evidence introduced by these respondents tended to show that Edward K. Schwartz had performed legal services for Albert Fein, husband of the appellant, for a period of approximately 25 years and, in addition, maintained a business relationship with him at intervals. After Burnett Schwartz joined his father in the practice of the law, the son began to handle the legal matters for Albert Fein and, in time, performed virtually all of the services pertaining to the legal matters of Albert Fein and his wife, the appellant.

The record in this case is voluminous and a considerable part of the record is devoted to an itemization of the legal services rendered to Albert Fein, Fannie Fein, appellant herein, and the corporation in which both were interested. No useful purpose would be served in detailing the nature of the services that were not connected with the matter in which the present lawsuit is concerned, but it is sufficient to say that the services were more or less continuous over a period of 25 years prior to the trial and, as stated by Burnett Schwartz, the number of matters handled by them "would run into the hundreds" if those of a minor nature were included. The record indicates that matters of greater importance, handled by the respondents, numbered approximately 25 and that the largest single fee received by them for any one matter was $1000.

In all matters in which appellant was concerned individually or in which she had an interest in a corporate matter, she was represented by her husband, Albert Fein. It appears that in all matters in which appellant was the party in interest the handling of her legal matters was exclusively in the hands of her husband, Albert Fein. Re-

spondents read into evidence as admissions against interest testimony of the appellant, Fannie Fein, contained in her deposition. In this testimony she admitted that respondents had represented her in the past and when her attention was directed to the Authority's preliminary inquiry about taking the Midtown Hotel property, she answered: "My husband really handled these things." She was asked, "Did you, yourself, negotiate with anyone about the condemnation or sale of the Midland [sic] Hotel?" and she answered, "No." She was asked, "Was that all handled by your husband" and she answered, "Right."

Respondents knew that the property located at 2935 Lawton Avenue, referred to in the trial of the case as Midtown Hotel property, was in an area contemplated for redevelopment by the Authority and in the early part of 1956 the subject of the possible condemnation of this property came up for discussion between them and Mr. Fein, husband of the appellant, and the possible condemnation of this property came up frequently in discussions thereafter. When respondents would discuss the matter of legal fees with Mr. Fein in regard to other matters they were handling, he told them to wait until the hotel property was sold at which time they would be paid a good fee.

In March of 1958 when it appeared that the Authority would appoint appraisers to establish values for the property to be taken in the Mill Creek Project Area, Mr. Fein again brought up the subject matter with the respondents. Respondents had many discussions in their office and over the telephone with Mr. Fein with regard to the possible condemnation or the acquisition of the property by the Authority. On an occasion during March of 1958, when one of these discussions was taking place as to the future of the Midtown Hotel property, the subject of fees again came up for discussion, after Mr. Fein told respondents he wanted them to get busy on the matter immediately. There followed a discussion as to the fee and the respondents told Mr. Fein that they would offer their services until the prop-

erty was taken by condemnation or a deal was made for its acquisition by the Authority "for a fee of five percent of the total amount that was finally paid for the property," whether it was as a "result of negotiation or if they (the Authority) got it by litigation * * *." Mr. Fein told them it sounded like a fair deal and that he preferred it that (contingent) way and again told respondents to get started on the matter immediately.

Thereafter, both respondents made a trip to see Mr. Arthur Schneider, who was engaged in the real estate business, for the purpose of having him act as an appraiser of the property in the event an appraisal was needed. They learned that Mr. Schneider was employed by the Authority, which precluded him from doing any appraisal work for the respondents in behalf of appellant. They learned from him that the appraiser for the Midtown Hotel property would be Mr. McReynolds. Mr. Schneider volunteered to give them advice on what matters should be brought to the attention of the appraiser and in response to this offer respondent, Burnett Schwartz, visited Mr. Schneider on two additional occasions for the purpose of obtaining this advice. Thereafter, respondents contacted Mr. McReynolds and in response to his suggestion, wrote him a letter on May 22, 1958, wherein they detailed data and information concerning rentals on the Midtown Hotel property, the circumstances of a prior lease, insurance, option to purchase and the amount of a first deed of trust that had been placed on the property. This letter also contained information showing that $153,000 had been expended in improving the real estate since the termination of the lease mentioned in the letter. Thereafter, both respondents, at intervals, would meet with Mr. McReynolds in connection with the acquisition of the property by the Authority. Both respondents denied that they told Mr. Fein they knew Mr. Schneider was employed by the Authority and denied that they told Mr. Fein they had an "in" with Mr. Schneider or that he was in their "hip pocket."

In the course of the discussions relative to the aforesaid property Mr. Fein asked respondents to handle other parcels of property owned by Mr. Fein's father or in which he had some interest which were in the redevelopment area.

Respondent, Burnett Schwartz, testified to the services rendered in connection with the hotel property and its ultimate acquisition by the Authority. He testified to a number of negotiations and discussions with representatives of the Authority which took place during the years 1958, 1959 and 1960. Some of his testimony in connection with the matter was supported by memoranda contained in file folders for those respective years and which were introduced in evidence. We refrain from reciting the many details of this testimony concerning the activities of respondents in connection with their employment for the three years mentioned and will content ourselves with merely pointing out some of the major efforts on their part from which we may determine whether or not they diligently applied themselves to the performance of the service entrusted to them by the appellant and her husband.

Burnett Schwartz met with various parties to get background information about the hotel property in order to use this information in his negotiations with Mr. McReynolds. During the time respondents were dealing with Mr. McReynolds the Authority requested a letter from the owner of the property involved showing that respondents represented her. In response to that request, on July 23, 1958, the appellant, Fannie Fein, forwarded a letter to the Authority in which she said:

"Gentlemen:

"Will you please take up the matter of the purchase of the real estate which I own at 2935 Lawton Avenue, with Edward K. Schwartz and Burnett Schwartz, my attorneys, located at 722 Chestnut Street, St. Louis 1, Missouri. We would

like to go into this matter as soon as possible.

"Yours very truly,
(S) Fannie Fein."

During the negotiations Mr. McReynolds viewed the property and submitted an appraisal dated April 29, 1958, which showed that in his opinion the fair market value of the property as of that date was $285,000.

Burnett Schwartz also met several times with other representatives of the Authority and had a number of discussions with Mr. Thomas O'Toole, who was the chief negotiator for the Authority. The original offer of the Authority to Burnett Schwartz was $200,000 for this property, which was later raised to $220,000 and then to $250,000. He had meetings with the accountant for the appellant and her husband regarding expenditures that had gone into the hotel property and had discussions with several real estate appraisers during the period of some of these discussions. The latter part of 1958 Burnett Schwartz learned that the Authority was making a deal with the father of Mr. Fein and Burnett Schwartz called Mr. Fein to remind him of his agreement to pay five percent of any amount recovered. Mr. Fein then told Burnett Schwartz that the respondents stood to make a fee of $20,000 in connection with the disposition of the Midtown Hotel property because he was sure the Authority would pay $400,000 since he professed to know of an appraisal at $375,-000. Mr. Fein agreed to pay the respondents a fee of $300 for the services rendered on the parcel of property sold by the father of Mr. Fein, which bill was paid. Mr. Fein was apprised of the progress of the negotiations at all times. Before respondent, Burnett Schwartz, told Mr. Fein that he had the offer of $250,000, Mr. Fein told him that a Mr. Sam Michelson, a real estate dealer, could get him $225,000 or $235,000. Thereupon, Burnett Schwartz told Mr. Fein that he had an offer of $250,000 but that he felt they could do better than that offer. Shortly after Burnett Schwartz notified Mr. Fein of this offer of $250,000, he received a letter dated February 2, 1959, signed by appellant herein and "Albert Fein Agent" wherein they informed Burnett Schwartz that "we do not want your legal services any longer in negotiating for the sale of the MIDTOWN HOTEL and other properties which are pending with the Land Clearance Corporation of St. Louis, Missouri." A copy of this letter was forwarded to the Authority. Thereafter, Burnett Schwartz contacted Mr. Fein and reminded him of the agreement to pay a fee of five percent and that respondents had performed substantial services in connection with the property. He said that Mr. Fein told him "Sam Michelson had some sort of an in out there" (meaning with the Authority) and that he felt that Sam Michelson might squeeze a "few extra dollars out of the Authority." Despite the letter of discharge respondents continued to represent appellant and her husband in connection with the Midtown Hotel property.

On May 12, 1959, which was several months after the letter of discharge had been forwarded, Mr. Fein received a letter from the real estate office of Oreon Scott informing him that the fire and extended coverage insurance on the Midtown Hotel property which had expired would not be renewed and that they were having difficulty getting other policies renewed that were about to expire and asked information as to when the Land Clearance Authority was going to take over the property. Mr. Fein sent this letter to the respondents with the notation on the bottom of the letter:

"Burnett:

"See what you think about this. This area is now on the bad risk as they don't want to stay on risk as there is now too many vacant bldg. in this area & it seems it is getting worse as time goes on.

"Sincerely yours,
Albert Fein."

On June 15, 1959, which was subsequent to the receipt of the aforesaid letter and note, respondents wrote to the Authority

stating that it appeared that an agreement with regard to the purchase price to be paid for the property involved could not be reached and that because of the vacancies and the consequent inability to renew the fire insurance on the property, that "it is imperative that you have your condemnation suit instituted so that this matter can be disposed of before our client sustains any irreparable loss."

In December of 1959, Burnett Schwartz called at the home of appellant and her husband and informed Mr. Fein that he learned that there was a deal pending to sell the property to the Authority for $262,000. He cautioned Mr. Fein against accepting the deal and told him that he thought $300,000 would be obtained for the property. Mr. Fein then told him he wanted to talk to Mr. Sam Michelson about the proposition.

On February 3, 1960, Burnett Schwartz received, via registered mail, the following letter:

"Dear Burnett:

"This is to inform you, as of today, that we do not want your legal services any longer in negotiating for the sale of the MIDTOWN HOTEL which is pending with the Land Clearance Corporation of St. Louis, Missouri.

"Sincerely,

FANNIE FEIN,
OWNER MIDTOWN HOTEL."

After receipt of the aforesaid letter, Burnett Schwartz again called Mr. Fein and reminded him of the agreement to be paid five percent of the amount that was finally recovered for the property and advised Mr. Fein not to accept the $262,000 which had been offered at that time. Mr. Fein again told Burnett Schwartz that Sam Michelson was close to the Land Clearance people and could get a few more dollars for him and that Sam Michelson was not going to charge him and, therefore, he did not want respondents to do anything further with the Authority. However, subsequent to this conversation, Mr. Fein brought to the attention of the respondents a contention of the Title Insurance Corporation that a certain judgment constituted a cloud upon the title to the hotel property.

In the early part of the summer of 1960, Burnett Schwartz had a number of discussions with the representatives and attorney for the Title Insurance Corporation regarding this matter and during his negotiations with the Title Insurance Corporation he had several discussions with Mr. Fein regarding the matter.

In his cross-examination Burnett Schwartz testified that after receiving a letter of discharge in 1959, Mr. Fein told him in his discussions to go ahead with the handling of the property and to push it with the Land Clearance Authority.

Respondents did not tell the Authority about their fee arrangement with the client, except that Burnett Schwartz made known orally to Irv Degan, attorney for the Authority, the fee arrangement he had with his client.

No time record of the services performed was kept in connection with the Midtown Hotel matter. No condemnation petition was ever filed by the Authority against the owner of the Midtown Hotel property, although Burnett Schwartz testified that he urged the Authority to bring such proceeding.

Mr. Thomas O'Toole, who was with the Authority in charge of real estate until September 1959, testified in respondents' case that he was contacted by the respondents about this property in behalf of the owner and his testimony supported that given by Burnett Schwartz as to the negotiations and discussions he had in connection with this property. He said Burnett Schwartz presented him with various figures in an effort to persuade him to make a higher offer. He said that if the property could not be acquired through negotiation then ultimately it would have to go through the process of condemnation.

Arthur A. Schneider testified in behalf of respondents and said he was approached by them to make an appraisal on the Midtown Hotel property but told them he could not make the appraisal because he had been employed by the Authority. He said he advised them as to the various approaches they could use in arriving at the value of the property.

On May 4, 1960, appellant, Fannie Fein, executed an instrument wherein she offered and agreed to sell and convey to the Authority the Midtown Hotel property at 2935 Lawton Avenue for $292,000. The instrument shows that it was "signed, sealed and delivered in the presence of Sam Michelson." This written offer and agreement to sell was accepted on June 7, 1960, by the Land Clearance Authority, with a proviso that the "closing shall be on or before 90 days after acceptance of this option by the Authority." Respondents did not receive a copy of this offer and agreement to sell and its acceptance by the Authority.

On September 10, 1960, Burnett Schwartz was injured in an automobile accident and at that time he knew the Authority had come to an agreement with the appellant to pay her $292,000 and was about to acquire the title to the property. About the time Burnett Schwartz had the automobile accident Edward K. Schwartz learned from the Title Insurance Corporation, which was the distributing or escrow agent for the Authority at the time the sale was closed on the Midtown Hotel property, that the papers were ready for inspection and that the closing date would be in a few days. He called Mr. Fein and told him about his knowledge of this and Mr. Fein told Edward Schwartz that because Burnett Schwartz had been injured in an accident they had decided to engage other counsel. Edward Schwartz told him that he was able to look after the matter and later he was informed by Mr. Fein that appellant, his wife, had made a decision not to use the respondent Edward Schwartz.

Matthew J. Maloney testified in respondents' case that he was employed by the Title Insurance Corporation and that this corporation handled some of the closings and escrow matters of the Authority. He said the closing concerning the Midtown Hotel property was assigned to them in June of 1960. He said there was a possible cloud on the title concerning a judgment of $15,000 and that their attorney insisted that this amount of money be held in escrow or some security be given to the title company for that amount. He said that Burnett Schwartz visited their office and wanted to know why they were contemplating withholding this amount of money and thereafter Burnett Schwartz tried to work out some sort of an arrangement concerning this judgment in order to close the deal. He said he had no discussions about that judgment or its effect on the title with anyone, other than Burnett Schwartz and his father.

Mr. John A. Arnold, attorney for the Title Insurance Corporation, testified that he discussed with Burnett Schwartz the matter of the cloud of this judgment on the title to the property. He thought that the discussions took place about the time of the closing of the transaction. He could not recall talking to anyone else about this possible cloud on the title.

Throughout the testimony it is shown that Mr. Fein enlisted or engaged the services of another attorney, Harry Levi, of a former Magistrate and, as we have pointed out, of Mr. Sam Michelson. Mr. Thomas O'Toole testified he was called on numerous occasions by parties "one way or another" who were interested in helping Mr. Fein "or representing him, and people whom I felt very often were not authorized at all—real estate people, primarily." The final attorney to enter the picture as a representative of the appellant and Mr. Fein was Mr. Irl Baris who is representing appellant in this appeal and who represented appellant in the trial of this matter.

On September 16, 1960, H. Jackson Daniel, attorney for the respondents herein, served upon the Authority and the Title Insurance Corporation of St. Louis a letter containing a formal notice of lien by the respondents herein, attaching to and running against the fund that was then held in escrow by the Title Insurance Corporation for the benefit of the appellant. The important parts of this notice are as follows:

"Please take notice that this office has been retained by the law office of Schwartz, Schwartz and Landsman and Attorney Burnett Schwartz, a partner in that firm, in connection with their attorneys' lien concerning the condemnation of the Lawton Blvd. property above named.

"This will assert the claim of these attorneys, the result of an agreement between the attorneys and the Fines, for a professional fee in a very substantial amount (approximately $15,000) against Fannie Fine, the owner of said property, and her husband Albert Fine; the fee arising out of the attorney-client relationship * * * in connection with the condemnation by the Land Clearance for Redevelopment Authority of the Lawton Blvd. property.

"Our information is that at the present time a fund in the sum of approximately $292,000 is escrowed by you at Title Insurance Corporation for the benefit of the Fines.

"This will assert the formal notice of lien by Messrs. Schwartz, Schwartz and Landsman and Burnett Schwartz attaching to and running against that specific fund. You are notified herewith not to permit any payment of this fund to the Fines until the attorneys' lien thereon has been fully satisfied."

Thereafter, the notice cited in full Section 484.140 RSMo 1949. It was admitted by the appellant that the aforesaid letter was sent to the Authority and to the Title Insurance Corporation.

The evidence submitted by appellant tended to show that she held the title to the Midtown Hotel property but that her husband was the active manager of the property. She became aware that the property was in the area subject to urban redevelopment but had no conversation with the respondents concerning their handling of the prospective condemnation. However, she said she was aware that her husband had some discussions with them concerning it, and she recalled signing a letter addressed to the Authority authorizing them to take up negotiations with the respondents. She did not know of any financial fee arrangement that had been made with the respondents concerning their representation of her. She recalled sending the two letters, one in February of 1959, and the other in February of 1960, discharging respondents, stating that these letters were sent because "we didn't want their services to represent us with Land Clearance," contending they were dissatisfied with the respondents' services because they were not getting a satisfactory figure. She was not aware that respondents were still negotiating or involved in the matter after sending the letter of February 3, 1960. She did not authorize her husband to enter into an arrangement with respondents to pay them five percent of whatever would be collected on the sale of the Midtown Hotel property, however, admitting that she figured she would have to pay a fair fee, but she had no idea as to the amount. She admitted that respondents had done legal work for her over the years, but said it was all handled by her husband and that the matter of legal fees was also handled by her husband. She never talked to Mr. Sam Michelson about the matter, stating, it was all handled by her husband.

Mr. Fein, in his testimony, said he had several conversations with Mr. O'Toole and that he had asked respondents at the time to accompany him "not only as attorney, but advisor and friend on prices being offered." Mr. Fein said the respondents never did tell him that they wanted a fee of five percent and he never told them that he and his wife

would be willing to pay a fee of five percent. He said that a fee never came into the conversation and his wife had never authorized him to pay such a fee. He had no objection to the letter to the Authority showing that respondents represented them in the negotiation concerning the Midtown Hotel property. He said respondents told him that Arthur Schneider was their contact man at the Authority and that "they could get him to do most anything they wanted him to do. That's the reason I had my wife sign this. I thought it was a good way of getting a good price for the hotel." He said that Burnett Schwartz would never tell him about any progress made on the negotiations and he had to pull information out of him. He said every time he asked Burnett about the matter he would be told that Mr. Schneider is doing all he can and that it just takes time. At no time did respondents discuss any figure. He admitted discussing the hotel condemnation with Harry Levi, another attorney, which was about four or five days before the letter of February 2, 1959, was sent, discharging respondents. Thereafter, he told Burnett Schwartz that he was not getting anywhere and that he wanted to try someone else. He said that he had not fired him as an attorney but he just asked him to step aside in the matter, stating, "I was trying to get every dollar I could out of it."

His explanation of the note on the bottom of the letter from the Oreon Scott Real Estate Agency relative to the insurance, was that he merely asked Burnett to give him a helping hand in placing the insurance. He did not ask Burnett Schwartz to tell the Land Clearance Authority to institute condemnation proceedings as soon as possible. He did not know that Burnett Schwartz was continuing negotiations with the Authority at that time. After the first letter of discharge he said he had Harry Levi, Sam Michelson, and a Magistrate representing him in connection with the property. He said Burnett Schwartz told him it did not make any difference how many parties he had representing him that "we can block

every move. You will never close the deal out unless you use Dad and me." Thereafter, the letter of February 3rd, 1960, was sent, registered mail, copy of which was sent to the Authority. He said he did not hear anything more about the hotel matter until Edward Schwartz called him one morning and told him that he was going to be at the closing of the hotel deal at the Title Insurance Corporation. Mr. Fein told him that it was not necessary for him to be there, that he had made other arrangements and that he and his wife had another attorney. He said that the sales price, to the Authority, for the property was $292,000. He paid Mr. Sam Michelson $1000 and the Magistrate $1000 for their services in the deal. He denied that Burnett Schwartz told him not to take the $262,000. He said no figures were mentioned. He said he did not expect respondents to perform their legal services for nothing and that he expected to be charged a reasonable legal fee. He said he did not know that respondents were working with the Title Insurance Corporation about the matter of the judgment on the title and that he did not discuss with Burnett the possibility of clearing that cloud off of the title.

Mr. Irl Baris, attorney for the appellant in this appeal, and at the trial below, testified that on September 16, 1960, Mr. Fein called him with reference to the closing of the transfer of the property. At his request he went to the Title Insurance Corporation to close the deal on September 19, 1960. He did not know that the respondents had represented the appellant in this matter until the lien letter was served upon the Title Insurance Corporation.

Mr. Sam Michelson testified in behalf of the appellant and said he was first asked to handle the negotiations of the sale of the Midtown Hotel property to the Authority in the early part of 1959. He testified in detail as to his services. He said he was paid a fee of $1000 in the matter after the closing of the deal and when asked if he thought it was a reasonable and satisfactory fee for his services, he answered, "Well, let's say, that I suffered." Mr. Michelson said he

recommended to the appellant and Mr. Fein that they accept the price of $262,000 and they refused to accept the deal. He said all of his dealings were with Mr. Fein.

At the conclusion of all of the evidence appellant made a formal request "for findings of fact and conclusions of law." Appellant now complains that the trial court failed to make proper and complete findings of fact and conclusions of law. In this connection she contends that the trial court failed to find that her husband was authorized to act in her behalf and that she had authorized him to enter into a contract in her behalf. She further contends that the court failed to find that she knew of such contract and also that the court failed to find that she ratified the act of her husband, Mr. Fein.

■ At the conclusion of the trial the court dictated to the court reporter and later filed a brief opinion containing a statement of the grounds for its decision and we think included in its opinion and statement findings on the principal controverted fact issues. In paragraph 3 of its findings of fact it found that appellant acting by and through her husband, Albert Fein, her authorized agent, employed respondents as her attorneys, to represent her in connection with the threatened institution of condemnation proceedings by the Authority and to render professional services to obtain for her fair and reasonable compensation for said property. In paragraph 4 of said findings of fact the court further found that appellant later confirmed and ratified the said employment of respondents by her husband by sending the letter to the Authority authorizing them to represent her in dealing with the Authority in reference to the property. We find that these findings made by the court are correct and adopt them as our own. Other facts on which appellant contends the court should have made findings, in our opinion were not "principal controverted fact issues" as contemplated in Civil Rule 73.01(b) V.A.M.R., and as the rule provides "[a]ll fact issues upon which no specific findings are made

shall be deemed found in accordance with the result reached." There is no merit in this contention of the appellant.

■ In this same area the appellant makes a further contention. As we have pointed out, at the conclusion of the trial the court dictated its opinion and findings and then entered a judgment and decree in accordance with the prayer of Count I of respondents' answer and interplea. The court found that respondents were entitled to the sum of $14,600 to be paid out of the sum of $15,000 which had been paid into the registry of the court. In this judgment the court failed to rule on Count II of respondents' answer and interplea, failed to rule on appellant's counterclaim and failed to make any order regarding the $400 left in the registry of the court. Within thirty days the court on its own motion filed an amended order, judgment and decree wherein it included an order dismissing Count II of respondents' answer and interplea, dismissing appellant's counterclaim and directing the balance of the fund on deposit with the court be paid over to the appellant.

■ Appellant now contends that the trial court had no jurisdiction to enter the amended judgment and decree in the absence of a motion filed by respondents to amend the original order and decree which motion is provided for in Civil Rule 73.01 (c) V.A.M.R. There is no validity to this contention because Civil Rule 75.01 V.A. M.R., gives to the trial court the right to amend its judgment during the thirty day period after entry of judgment. The two rules referred to are not mutually exclusive, but Civil Rule 73.01 provides for amendment on motion by the parties, whereas, Civil Rule 75.01 permits the trial court on its own motion to amend the judgment.

Before discussing the principal contention of appellant we consider appellant's contention that respondents failed to show that the contract on which they base their claim was fair and reasonable, free from fraud and undue influence. Prior to answering this contention we should determine

whether the trial court was correct in finding that there existed an agreement between respondents and Mr. Fein, agent for the appellant, to pay a fee. In this connection the trial court found in paragraphs 5, 6 and 11 of its findings of fact that there was a contract between appellant and the respondents which provided that respondents would receive five percent of the amount to be paid appellant as compensation for such property by the Authority and that respondents "rendered various and sundry legal services at different times in pursuance of their employment under said contract" with appellant. The court further found that based upon said contract of employment the fee due respondents was the sum of $14,600 which is five percent of the amount paid appellant as compensation for her property by the Authority.

■ Our summation of the evidence clearly demonstrates that appellant and her husband were in complete disagreement with the respondents as to the existence of such an agreement. Without restating all of the evidence on this trial issue, we merely content ourselves with pointing out that respondents'. evidence showed that Mr. Fein, agent for appellant, agreed to the payment of five percent of the total amount recovered for the property and said that he preferred that it be on a contingent fee basis, rather than any other basis. Respondents' evidence also showed that Mr. Fein told them that they stood to make a fee of $20,000 because he, Mr. Fein, was sure the Authority would pay $400,000 for the property. This statement by appellant's husband, if found to be true, confirmed the existence of an agreement to pay five percent of any amount recovered as payment for the property. Opposed to this is the testimony of appellant and her husband that respondents never did tell them that they wanted a fee of five percent and that they never told respondents they would be willing to pay five percent. Therefore, as to this issue, the evidence is in hopeless conflict and wholly irreconcilable. In such a situation, even though we have the right

to consider the evidence and make our own findings and conclusion, we defer to the findings of the trial court upon this highly controverted factual issue, inasmuch as any determination of the issue must necessarily rest upon the credibility of the witnesses and of the weight to be given to their testimony. We find the trial court's findings on this issue to be correct and adopt them as our own.

■ Directing our attention to the contention of appellant that respondents failed to sustain the burden in the respects complained of, we agree with their understanding of the law that where a contract for compensation is executed by an attorney and his client *after the establishment of the fiduciary relation,* the burden is on the attorney to show that the transaction was fair, that the compensation provided for did not exceed a fair and reasonable remuneration for the services rendered or to be rendered, that the contract was free from all fraud and undue influence and that it was entered into by the client freely and with a full understanding as to her rights. Morton v. Forsee, 249 Mo. 409, 155 S.W. 765; Barthels v. Garrels, 206 Mo.App. 199, 227 S.W. 910; 7 Am.Jur.2d, Attorneys at Law, § 267, p. 196.

■ On the question of whether or not five percent represented a fair and reasonable remuneration for the services rendered and to be rendered, we point out that respondent, Edward Schwartz, testified that five percent was the customary fee for selling the property in that area if handled by a real estate broker. When this testimony was given appellant's counsel stated that it is now six percent. When the nature and scope of the negotiations reflected by the record in this case are considered, and the possibility of condemnation litigation, together with respondents' representation as attorneys for the appellant over a long period of time and the further evidence that when respondents asked for fees in other matters, they were told that they would receive a good fee when the hotel property

was sold, we find that the contract was fairly entered into, that no undue advantage was taken of the appellant or her husband and that the services rendered were reasonably worth the contingent fee agreed upon, especially when the amount involved is considered. We further find that respondents' dealings with appellant and her husband in all of the matters connected with the acquisition of the property and with the agreement were free of fraud and undue influence. Barthels v. Garrels, supra, l. c. 227 S.W. 914.

■ Appellant next contends that the contract violated various sections of the Statute of Frauds. In support of this appellant contends that respondents rely on the agreement made only by her husband and that to hold her responsible for this agreement would require her to answer for the "debt, default or miscarriage of another person" in violation of the Statute of Frauds. Of course, this is incorrect, since the trial court found, and we find, that the agreement was entered into by respondents with appellant, acting by and through her husband, Albert Fein, her authorized agent. There is no substance to this contention. She also contends that respondents base their claim on a contract made for the sale of land. Such a contention is difficult to understand when the pleadings and evidence clearly show that respondents' claim of a lien was based upon a contract with the appellant for the performance of personal services in connection with the sale or condemnation of the property involved. The contract did not give to the respondents a five percent interest in the property, but merely gave them the right to collect as a fee five percent of the sum paid appellant for the property.

■ In further support of this contention appellant states that the agreement was not to be performed within one year from the making thereof and, not being in writing, it was within the Statute of Frauds. There is no merit to this contention, because there was a possibility that the contract could have been performed within one year or less. It was possible for the parties negotiating to have agreed upon a satisfactory price for the property within a period far less than one year. It is the law that if there is a possibility of performance of the agreement within a year an oral contract is not barred by the Statute of Frauds. McGuire v. Hutchison, 240 Mo.App. 504, 210 S.W.2d 521, l. c. 528; Hammack v. Friend, 180 Mo.App. 472, 166 S.W. 647. There is no merit to appellant's contention that the contract involved falls within the provisions of the Statute of Frauds.

■ Continuing her attack on the contract, appellant contends that it was a unilateral contract, that it lacked mutuality and that she had the right to discharge respondents. In support of this she contends that under the contract the respondents were required to do nothing. It is clear from the evidence that the contract was bilateral in nature. It required respondents to render legal services to the appellant, either through negotiation or in an action in condemnation and it required appellant to pay respondents five percent of the proceeds recovered, either as result of negotiation or condemnation. One thing that appellant seems to have overlooked is that this is an action to enforce an attorney's lien and that the contract of employment, once established, cannot be revoked to the defeat of the attorney's lien.

In the case of In re Downs, Mo., 363 S.W.2d 679, l. c. 686, the court said:

"* * * if the lawyer has a contingent contract and is without fault, he has the election to claim a reasonable fee for the work done, as upon a mutual rescission, or to wait until the claim is liquidated by judgment or settlement and then sue (if necessary) for his contract fee."

See also Mills v. Metropolitan Street Railway, 282 Mo. 118, 221 S.W. 1, and Barthels v. Garrels, supra. This contention of appellant must fail.

We now discuss the principal point relied on by appellant that repondents are not entitled to an attorney's lien. In support of this she contends (1) that an attorney's lien is not authorized in a matter of this nature, (2) that the notice of lien was defective because it was not served by the attorneys claiming the lien, (3) that the form of the notice was insufficient because it failed to state "the interest—in such claim or cause of action," (4) that if the notice was in proper form, it was served too late, (5) that on the date on which the notice was served, namely, September 16, 1960, the sale and purchase had been agreed to (on June 7, 1960), therefore, there could have been no suit contemplated and no "defendant or proposed defendant."

The trial court in its judgments and decrees, when referring to the applicable lien statute, referred to § 484.130 RSMo 1959, in some instances and in others referred to § 484.140 RSMo 1959, V.A.M.S. The court was in error in referring to § 484.130, because this section is only applicable "[f]rom the commencement of an action or the service of an answer containing a counterclaim." Therefore, it is obvious that this section of the statute cannot be applied to the facts in this case. However, we think that § 484.140, is applicable and all of our discussions will concern that section of the statute.

The pertinent parts of § 484.140 provide that:

"In all suits in equity and in all actions or proposed actions at law, * * * it shall be lawful for an attorney at law either before suit or action is brought, or after suit or action is brought, to contract with his client for legal services rendered or to be rendered him for a certain portion or percentage of the proceeds of any settlement of his client's claim or cause of action, either before the institution of suit or action, or at any stage after the institution of suit or action, and upon notice in writing by the attorney who has made such agreement with his client, served upon the defendant or defendants, or proposed defendant or defendants, that he has such an agreement with his client, stating therein the interest he has in such claim or cause of action, then said agreement shall operate from the date of the service of said notice as a lien upon the claim or cause of action, and upon the proceeds of any settlement thereof for such attorney's portion or percentage thereof, which the client may have against the defendant or defendants, or proposed defendant or defendants, * * *."

The provisions of the statute for attorney's liens are remedial and are liberally construed. Brookshire v. Metropolitan Life Ins. Co., Mo.App., 56 S.W.2d 817, and cases cited therein. We said in Satterfield v Southern Railway Company, Mo. App., 287 S.W.2d 395, l. c. 397:

"So it has been demonstrated that our courts have adopted a policy with respect to enforcement of the lien created by the statute that will give real meaning to the obvious purpose of the statute, i. e., to provide protection in fact for the attorney who has rendered services to a client. As has been stated, our courts 'have been assiduous in devising for its enforcement [referring to lien] modes of procedure conformable to "those general rules established in our system of jurisprudence for the security of private rights."'"

In the case of Orr v. Mutual Ben. Health & Accident Assn., 240 Mo.App. 236, 207 S.W.2d 511, the court in quoting from Baucke v. Adams, 239 Mo.App. 84, 188 S.W.2d 355, 368, said: "The law is, as it should be, zealous in the protection of an attorney respecting his compensation for services rendered. Such is the purpose of the statutory provisions therefor. Sections 13337 and 13338 R.S.Mo 1939, Mo.R.S.A. * * *" Also, see Baur v. Dirhold, Mo. App., 82 S.W.2d 133.

We shall discuss seriatim appellant's contentions in support of her principal point. (1) She argues that a contingency arrangement in a condemnation suit would not be within the provisions of Section 484.140. She asserts that a proceeding in eminent domain by the Authority is not an equity suit or an action but is a statutory proceeding. In support of this, she cites the case of State ex rel. Fugatt v. Hawkins, 241 Mo.App. 640, 264 S.W.2d 387, wherein the court said that a condemnation proceeding is a special proceeding within the meaning of the *special service statute*. In the aforesaid case the court had before it the question of whether or not a condemnation was a special proceeding for purposes of determining a right to obtain service of process in a manner other than personal service. In the instant case the question is whether an action or a proposed action in condemnation comes within the purview of the attorney's lien statute. In the Hawkins case (264 S.W.2d l. c. 393) the court quoted at length from 29 C.J.S. Eminent Domain § 209, p. 1127. Apropos to our question is the following: "While condemnation proceedings have been held to be summary in their nature, inquisitorial in character, and largely administrative, yet generally the proceedings are judicial and involve the exercise of judicial power." In the Hawkins case the court also cited the case of Milwaukee Light, Heat and Traction Co. v. Ela Co., 142 Wis. 424, 125 N.W. 903, 27 L.R.A.,N.S., 567, wherein it was held that a condemnation proceeding is a special proceeding and not an action. However, in making this statement the court had reference to the initial suit for condemnation, but the court pointed out that if there was an appeal from the award that it was then turned into an action in court and then, "shall be considered a distinct proceeding in court with the characteristics *of an action at law*. So the proceeding must be in the nature of a judicial controversy in court of some sort from the beginning to the end. * * * *In the broad sense, it is an action from the beginning,* in that it is a judicial remedy for the enforcement or protection of a right, * *." (Emphases ours.) (125 N.W. l. c. 905.) It is seen that the Wisconsin authority relied on in the Hawkins case held that when the condemnation proceeding is considered from the beginning to the end it is in the broad sense an action from the very beginning.

In the case of Universal Oil Products Co. v. Standard Oil Co., 6 F.Supp. 37, l. c. 39, the court said:

"A cause of action is a right which the law gives and which the law will enforce, a right to recover something from another. There are two ways in which he who has such a right may obtain satisfaction from him obligated. One of these is through the courts. The other is by private negotiation with the party from whom satisfaction is demanded."

In referring to the lien an attorney has, the court said (6 F.Supp. l. c. 40):

"The lien is upon the cause of action; that is, the right of a client under the law to recover something from his adversary. The lien is not restricted to the cause of action in so far only as it may be enforced in the courts, but is upon the cause of action without any such limitation; that is to say, it is upon the cause of action, whether prosecuted in the courts or by private negotiation out of the courts."

While this case did not involve condemnation, it did hold the right of the client (appellant) under the law to recover something from his adversary (the Authority) is a proposed cause of action.

While the initial proceeding in condemnation may be styled a special proceeding, it is, as has been pointed out, a judicial proceeding requiring the exercise of judicial power and is subject to judicial review. Even in its initial stage the condemnee may challenge the right to condemn. However, after the commissioners have determined their award and made their report to the court, the condemnee

has the right to file exceptions to the award and after exceptions are filed there can be little doubt but that it is an action and one contemplated within the provisions of § 484.140. It is true that the condemnor has the duty to negotiate before filing a condemnation suit, but as Mr. Thomas O'Toole said, in his testimony, that if the Authority could not acquire the property through negotiation then ultimately it would have to go through the process of condemnation. There is no doubt that while the negotiations proceeded there was at all times a proposed action of condemnation in the offing. Inasmuch as the evidence shows and we have found that respondents were engaged to render legal services in connection with the sale or the condemnation of appellant's property, we hold that a threatened condemnation action with the attendant right of appellant to file exceptions to the Commissioner's Report if she is not satisfied with the Commissioner's Award is as much a proposed action within the lien statute as is a personal injury action or an action to collect the proceeds of an insurance policy. Therefore, we hold the proposed action of condemnation to be an action within the provisions of § 484.140.

▮ Appellant's next contention (2) is that the notice of the attorney's lien in this case was defective because it was not served by the attorneys claiming the lien but by their attorney, Mr. Daniel. We think service through the agent and attorney of the attorneys claiming the lien is a sufficient compliance with the statute. As we have pointed out, the attorney's lien statute is to be liberally construed and the object of the statute is to give notice to the defendant or proposed defendant in writing and the notice may be served either by the attorney or his agent. The Authority and the Title Insurance Corporation do not contend that they were not served with a lien notice. We hold there was a sufficient compliance with the statute.

▮ Appellant's next contention (3) is that the form of the notice was insufficient because it failed to state "the interest—in such claim or cause of action." Under the statute the attorney in his lien notice was required to state "therein the interest he had in such claim or cause of action * *." The notice of the attorney's lien, as we have heretofore pointed out, stated that the interest of the attorney was "for a professional fee in a very substantial amount (approximately $15,000)." While the exact amount found to be due was $14,600, we think the interest as shown in the attorney's lien notice is a sufficient statement of the interest had by the attorney and sufficiently complies with the requirements of § 484.140.

▮ Appellant next contends (4) that the notice of lien was served too late because the "settlement" took place on or about June 7, 1960, which was three months prior to the notice. It is undisputed that the notice was served prior to the closing of the Midtown Hotel property transaction which took place on September 19, 1960. No money had passed from the Authority to appellant until the date of closing. There is no substance to this contention because when the appellant sued · the Authority to recover the $15,000 witheld at the time of the closing, she brought the suit against the Authority and thereby admitted that it was the holder of the money in question at the time of the closing and at the time of bringing her suit. This contention must fail.

▮ We find no merit in the fifth (5th) contention of appellant that on September 16, 1960, when the notice of lien was served there could have been no suit contemplated and no "defendant or proposed defendant." On the date of the service of notice of lien, the deal had not been closed, the Midtown Hotel property was still in the name of the appellant, therefore, until the title actually passed to the Authority, this property was subject to an action in condemnation by the Authority.

We have examined carefully the authorities cited by appellant in support of all of her contentions and find them inapplicable to the issue raised. To show the inapplicability of these citations would unduly burden this opinion. We find respondents were entitled to an attorney's lien.

In another point relied on by appellant she presents the contention that this was a law action rather than an equity suit and that she was entitled to a jury trial. The fallacy of this contention is that appellant insists that the portion of the petition and prayer pertaining to an attorney's lien, even if considered, was surplusage, and that respondents were merely asking for a judgment for $15,000 to be satisfied out of the money which had theretofore been deposited in court. Before the trial court had jurisdiction to order the judgment paid out of the money that had been deposited in the court, it had to find, as alleged in respondents' answer and interplea, that respondents had an attorney's lien under the statute and then, and only then, could it order the judgment of $14,600 paid out of the money on deposit in the court. Appellant devotes a considerable portion of her brief to the claim she was entitled to a jury trial. We think the answer to this contention may be found in the case of State ex rel. Anderson v. Roehrig, 320 Mo. 870, 8 S.W.2d 998, 1. c. 999, wherein the court, quoting from another opinion, said:

" 'The attorney's lien, whether under the statute or at common law, is equitable in its nature. Even the decisions in this country, which confine its existence and application to the narrowest limits, always speak of it as an equitable lien, right, or privilege. * * * But where the thing is not in possession, and some affirmative action is required by the attorney, he, like other lien claimants, must seek relief in equity. * * * equity is the only forum that can enforce by proper decree the lien rights, * * *.' "

In Brown v. Eagle-Picher Lead Co., Mo. App., 136 S.W.2d 708, 1. c. 709, the court said: "There is no question but that a proceeding such as this one is an equitable one, in that it is triable before a court of equity." This was an action to determine an attorney's lien. Also, see Mills v. Metropolitan Street Ry. Co., 282 Mo. 118, 221 S.W. 1, 1. c. 4; Catterfield v. Southern Railway Company, supra; Baur v. Dirhold, supra.

The instant suit is one in equity in which a trial by jury did not exist at common law and never has as a matter of right in this state. Lee v. Conran, 213 Mo. 404, 111 S.W. 1151, and Ely v. Coontz, 167 Mo. 371, 67 S.W. 299.

In another point plaintiff says that even if this case was properly in equity the trial court should have submitted the issues to a jury and its failure to do so constituted an abuse of discretion. It is true that the trial court may in an equity action, in its discretion, submit certain issues to a jury, but as the cases hold he is not bound by their verdict. Ely v. Coontz, supra. Appellant cites no case in support of her assertion and we find no abuse of discretion.

In the final point relied on by appellant she contends that the evidence was insufficient to sustain a judgment for respondents. Her principal argument in support of this contention is that her evidence was more believable than that of the respondents. As we have said heretofore, we have deferred to the findings of the trial court on the disputed questions of fact. What we have said heretofore sufficiently disposes of this point relied on by appellant.

We find no error and the judgment and decree of the trial court should be affirmed. It is so ordered.

WOLFE and ANDERSON, JJ., concur.